Commonwealth ex rel. Piper *v.* Edberg et ux., Appellants.

Argued January 18, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER and STEARNE, JJ.

*Cyrus A. Davis,* with him *Francis E. Criner,* for appellants.

*Joseph M. Loughran,* of *Scales, Loughran & Shaw,* for appellee.

OPINION BY MR. JUSTICE PARKER, March 22, 1943:

This is an appeal from an order of the Superior Court affirming an order of a court of common pleas in a habeas corpus proceeding awarding the custody of a female infant, one year of age, to the appellee, Marian L. Piper.

In May, 1940, Mrs. Mary Prunkard, mother of appellee by adoption, discovered that her daugher was pregnant by a married man. At the suggestion of Mrs. Prunkard, Marcus E. Piper married appellee on July 23, 1940. Piper admittedly was not the father of the infant child but knew when he married appellee that she

was pregnant by another man. The child Mona was born January 7, 1941. Several months prior to that date, Mrs. Prunkard, representing herself to be Mrs. Williams, a social worker, communicated with appellants, E. H. Edberg and Catherine Edberg, his wife, who had advertised in a Pittsburgh newspaper that they desired to adopt a child, and they agreed tentatively to adopt the child when it was born. On January 17, 1941, Mrs. Piper, who was then twenty years of age, and her husband signed an agreement giving custody of her girl baby, Mona, to Earnest Edberg and Catherine Edberg, his wife, and providing that they should have custody and control of the child for a period of one year without interference from the Pipers, that in consideration of the care, maintenance, and support of the child the Edbergs might adopt the child within the said period of a year, and that they would execute all releases and agreements necessary to effectuate such adoption. It is admitted that the import and seriousness of this agreement was fully explained to Mrs. Piper by the Edbergs' attorney before she signed the paper and made her commitments. Before Mrs. Edberg took the child she offered to tear up the agreement if Mrs. Piper so wished, but Mrs. Piper refused to keep the baby. The Edbergs then took the child from the hospital where it was born and have given it loving care from that time.

Mrs. Piper did not know the name of the Edbergs and Mrs. Prunkard never revealed it to her until about December 9, 1941. Shortly thereafter, Mrs. Piper repented of her action and endeavored to secure custody of the baby for herself. The Edbergs were unwilling to give up the child.

On December 24, 1941, the Edbergs presented a petition to the Orphans' Court of Westmoreland County for the adoption of the infant and a hearing was set for January 8, 1942. Notice of this hearing was served on Mrs. Piper December 29, 1941, and on the following day Mrs. Piper presented her petition to the Court of Common

Pleas of Westmoreland County for a writ of habeas corpus to obtain custody of the child. A hearing was held on this petition on January 6, 1942, and on January 15th a decree was handed down awarding custody of the child to Mrs. Piper. On appeal, the Superior Court affirmed this decree and this appeal was then allowed to this court.

The judge presiding in the court of common pleas, in his opinion filed, found: "The best interests of the child require that it should remain in the custody of the respondents, any legal presumption to the contrary notwithstanding, and were it not for some appellate court decisions and the fact that the relator is the natural mother of the infant, we would so decree, but we realize that the claims of a natural parent may not be lightly brushed aside. . . . We are constrained to believe, however, that the secular education and social standing, culture and environment given the baby by the respondents will exceed and be higher and better than that afforded by the relator." At the close of the opinion the court further stated that proof of the best interests of the child so slightly favored the Edbergs that it would be outweighed by the fact that Mrs. Piper is the natural mother of Mona.

The hearing on the adoption petition, after continuances, was finally held on January 26, 1942, and the prayer of the petition was granted February 12, 1942. The Pipers took an appeal to this court from the decree of adoption but failed to prosecute said appeal so that a judgment of non-pros was entered on September 28, 1942. In the adoption proceeding the orphans' court did not depend on the consent of the natural mother, then a minor, contained in the agreement between the parties, but on the fact that she had abandoned the child and that such consent was therefore not necessary. It did properly, however, consider the agreement as bearing on the question of abandonment: *Hazuka's Case*, 345 Pa. 432, 29 A. 2d 88. That decree stands unquestioned and we must assume that it is binding.

As a result of the two decrees by courts with different jurisdictions but in the same county, we have an anomalous situation. The orphans' court has decreed the adoption of the child by the Edbergs and that decree has become final; the court of common pleas has given custody of the child to the natural mother and the correctness of that decree alone is now before us. A number of matters have contributed to this predicament. We speak with restraint when we say that the foster mother, Mrs. Prunkard, used bad judgment throughout the history of this affair.

We think the judge in common pleas court erred initially in not postponing a hearing on the habeas corpus writ or at least in not withholding a decision until the conclusion of the adoption case which was first begun and of which he had notice. The history of habeas corpus is filled with instances where by comity courts have refrained from proceeding on the writ where the matter in controversy would be affected by a proceeding in another court which had taken prior jurisdiction. This is a power which should be exercised without hesitation. The common pleas court as much as admits responsibility for the unfortunate result when it said in its opinion: "We also realize that only confusion, trouble, misery and expense would result were we to award the custody of the child in question to the respondents and the orphans' court were to refuse their petition for adoption. Neither would the question be solved or the trouble alleviated if we were to award the custody of the infant to the relator and the orphans' court were to permit and authorize the adoption." It must be remembered that there was not a scrap of evidence in this case which would indicate that the welfare of the child would be prejudiced or adversely affected by leaving it in the hands of the respondents for a few weeks.

It is not difficult to conceive of a situation in which imminent danger to the welfare of a child might call for the summary remedy afforded by a writ of habeas

corpus. The mere fact that a petition for the adoption of a child is pending in an orphans' court does not deprive a court of common pleas of the power to issue a writ of habeas corpus for the custody of a child under all circumstances. We do hold, however, that the court of common pleas erred in failing to give due consideration to the pendency of the adoption proceeding and that the Superior Court erred in not giving consideration to the adoption of the child as an accomplished fact as the record then showed. As there was no testimony indicating that the child's welfare would be jeopardized by the temporary maintenance of the status, the order for custody should not have been made under the circumstances present here until a final determination in the adoption proceeding.

In disposing of this appeal we cannot ignore the existing fact that by a final decree Mona is now the adopted child of the appellants. When we consider, as is conceded on all hands, that the welfare of the child is a matter of paramount consideration in determining its custody, we can arrive at no other conclusion than that the child should remain where it is. The Act of July 11, 1917, P. L. 817, §1 (12 PS §1874), in providing for an appeal in a habeas corpus proceeding involving the custody of children, provides that the appellate court "shall consider the testimony and make such order upon the merits of the case, either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong." It therefore belongs in that class which demands of us the most careful consideration, for we are not reviewing a money judgment or one affecting the property rights of the parties but one dealing with a situation in which the natural and commendable emotions of the parties and the ultimate welfare of the child are involved: *Com. ex rel., Ganster v. McGee,* 103 Pa. Superior Ct. 12, 14, 157 A. 345.

After a careful reading of the record we agree with the conclusion of the court of common pleas that the

best interests of the child require that it remain with its adopting parents. The vacillating conduct of the natural mother, her abandonment of the child, and her abandonment of the appeal in the adoption proceeding more than offset any consideration that should be given to the fact that the appellee is the natural mother of Mona. It would serve no purpose to review all of the evidence bearing on the subject, but it has had our careful consideration. A natural mother could not have given more tender and intelligent attention to the welfare of this child than the appellants have, and under the circumstances we feel that it would be a grave injustice to the appellants and inimical to the welfare of the child to remove it from the home where it has been so tenderly cared for.

The order of the Superior Court and the decree of the court of common pleas are reversed and the child is remanded to the custody of the appellants, the costs to be paid by the appellee.